**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No.: ______________**

| | | |
|---|---|---|
| **JESSICA SIDHOM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT and DEMAND FOR JURY TRIAL** |
| **v.** | ) | |
| | ) | |
| **TRUIST BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

Plaintiff, Jessica Sidhom ("Sidhom"), by and through counsel, brings this action for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*., against Truist Bank ("Defendant"). Sidhom additionally brings a claim under North Carolina common law for wrongful discharge in violation of public policy.

## THE PARTIES

1. Sidhom is an adult individual who is a resident of Charlotte, North Carolina.

2. Defendant is a bank organized under the laws of the State of North Carolina with its principal office located at 214 North Tryon Street, Charlotte, North Carolina 28202. Defendant operates financial centers in multiple states, including throughout North Carolina.

## JURISDICTION AND VENUE

3. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 over the subject matter of the claims brought in violation of Title VII and the ADA.

4. Sidhom's wrongful discharge in violation of public policy claim is based on the law of the State of North Carolina. Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for

the state-law claim because it forms part of the same case or controversy as Sidhom's Title VII and ADA claims.

5. This Court has personal jurisdiction because Defendant maintains its principal place of business in Charlotte, North Carolina, and is at home in this State, and because the acts or omissions giving rise to Sidhom's Complaint occurred in Mecklenburg County, North Carolina.

6. Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 12117(a) because the unlawful employment practices alleged herein were committed in Mecklenburg County, North Carolina.

## COVERAGE ALLEGATIONS

7. At all relevant times, Sidhom was an "employee" covered by the protections of Title VII, within the meaning of 42 U.S.C. § 2000e(f).

8. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

9. Defendant employed more than 500 employees for each working day in each of twenty or more calendar weeks in 2024 and in 2025.

10. At all times relevant to this action, Sidhom was a "qualified individual" covered by the protections of the ADA, as amended, within the meaning of 42 U.S.C. § 12111(8).

11. At all relevant times, Defendant was a "covered entity" engaged in an industry affecting commerce and had fifteen (15) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

12. At all relevant times, Sidhom was an "employee" within the meaning of 42 U.S.C. § 12111(4).

13. Defendant is an "employer" within the meaning of 42 U.S.C. § 12111(5).

14. Sidhom satisfied her obligation to exhaust her administrative remedies by timely filing a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on sex and disability, including sexual harassment, a sex-based hostile work environment, retaliatory discharge, and the denial of a reasonable accommodation. Sidhom filed her Charge of Discrimination, Charge Number 430-2026-01543, on or about January 15, 2026. On or about August 14, 2026, the EEOC issued a Notice of Right to Sue, which Sidhom received on or about August 14, 2026. Sidhom brings this action within ninety (90) days of her receipt of the Notice of Right to Sue.

## PLAINTIFF'S FACTUAL ALLEGATIONS

15. Defendant is a financial services company headquartered in Charlotte, North Carolina, that provides commercial and corporate banking services to clients throughout the United States.

16. Sidhom is a female banking professional with more than a decade of experience in commercial and corporate banking. In 2013, the Charlotte Business Journal named her to its "40 Under 40" list, and she received the highest performance award at her prior firm.

17. Sidhom began her employment with Defendant on or about April 8, 2024, as a Middle Market Banker II in Defendant's Middle Market Banking division, part of Defendant's Commercial and Corporate Banking group, with the official title of Senior Vice President effective April 8, 2024. Her annual base salary was $260,000. Sidhom's job duties included managing the overall relationship of Defendant's privately owned clients, managing existing client relationships, and prospecting new clients for lending, deposit, and payment opportunities.

18. Throughout her employment, Sidhom's direct supervisor was Coulter Warlick ("Warlick"), Defendant's Middle Market Banking Leader. Warlick reported to Jenna Kelly ("Kelly"), Defendant's Regional President, who was Sidhom's second-level supervisor.

19. At all relevant times, Sidhom met or exceeded Defendant's legitimate employment expectations. She received a "building impact" rating on her 2024 annual performance review, successfully turned around multiple "exit threat" clients who had been dissatisfied with Defendant, and, on or about June 25, 2025, approximately one month before her termination, closed a significant transaction with a highly sought-after, generational-type company.

20. On or about April 17, 2025, Warlick sent Sidhom an unsolicited text message containing a TikTok video depicting two individuals engaged in a sexual act in a car, which the video's caption described as a "post-work booty call" on the rooftop of a Charlotte parking garage. Shocked by the grossly inappropriate message from her supervisor, Sidhom redirected the conversation, replying, "On a more work appropriate topic . . . ."

21. On or about October 31, 2024, less than seven months into Sidhom's employment and without any prior warnings, Warlick placed Sidhom on a Performance Corrective Action Plan ("CAP"). The stated reasons were generalized and lacked specific examples. When Sidhom requested specific examples of the teammate feedback referenced by Warlick, none were supplied. The CAP was to remain in effect for twelve months and required immediate improvement. The CAP never reached its end date because Defendant terminated Sidhom on July 22, 2025, approximately nine months after Defendant issued it.

22. Jonathan Viscount ("Viscount"), a male Middle Market banker who joined Sidhom's team around the same time she did and held the same Senior Vice President leadership level as Sidhom, was not placed on a CAP despite having similar production numbers. Following

Defendant's merger, job titles varied among bankers, but the Senior Vice President leadership level defined the performance expectations for bankers at that level, including Sidhom and Viscount. Defendant pulled each banker's production numbers from its Salesforce system and displayed them on a screen during meetings, where they were compared against one another and against the numbers of bankers in other markets across multiple states. Sidhom had access to these numbers and could pull them herself. Viscount had less than half of Sidhom's experience and had never held primary coverage or relationship management responsibilities prior to this role. Viscount remains employed by Defendant.

23. Sidhom refused to sign the CAP and returned the written document stating that she was suffering discrimination on the basis of sex and was not able to report it in any way that felt meaningful or safe. Sidhom gathered and submitted approximately twenty positive reviews from her teammates and partners to Defendant's Human Resources department, documenting her disagreement and noting in her submission that she was being subjected to bias and discrimination and that she was being treated differently than other similarly situated male employees. In her response to the CAP, Sidhom reported that she felt discriminated against and that there was not a safe space for employees to report that they were being discriminated against. She also noted that there was no safe place to share real feedback and work-related concerns in confidence without an employee's manager's direct knowledge. Sidhom received no follow-up from Human Resources or management regarding her submission.

24. Warlick and Kelly treated Sidhom less favorably than her male colleagues with respect to the terms and conditions of her employment, including by excluding her from meetings and events with her own clients and prospects. In or around September 2024 or October 2024, Warlick and Kelly met with Stephen Shuford, the Chief Executive Officer of Shurtape, a company

Defendant had assigned Sidhom to cover as its Relationship Manager, and did not include Sidhom in the meeting. In or around August 2024, Kelly asked Sidhom to invite Stacy Gray ("Gray"), General Counsel of Weisiger Group and one of Sidhom's prospects, to a dinner at Quail Hollow Club. Gray attended the dinner, as did Lisa Tucker, Chief Executive Officer of Shoe Show and one of Sidhom's clients, but Kelly did not include Sidhom. Warlick also took Sidhom's clients out without her.

25. Male managers, including Warlick, golfed with clients and prospects at least once per week. Despite knowing that female bankers also played golf, the male managers never invited female bankers to join these weekly out-of-office relationship-building activities.

26. Warlick publicized the male bankers who joined the team, including Viscount, Graham Holding, and Krutesh Trivedi ("Trivedi"), as new hires in the Charlotte Business Journal's "People on the Move" section. Warlick never did the same for Sidhom.

27. After completing a month-long exercise challenge in or around January 2025, Sidhom sustained a significant back injury. On or about February 1, 2025, while attending a gala, she experienced severe pain in her toe and hip and lost feeling in the two outer toes of her foot and along the outside of her leg. The injury substantially limited Sidhom's ability to stand, sit, lie down, and walk, and made driving excruciatingly painful. Sidhom received medical treatment for the injury from in or around February 2025 through in or around August 2025, including approximately twelve weeks of chiropractic care and physical therapy. Sidhom continues to experience severe muscle cramps several times per week that limit her ability to stand, sit, lie down, and walk in the same way.

28. In or around the week following her injury, Sidhom told Warlick and Kelly about her injury and told Warlick that she was not able to walk well. Sidhom, Warlick, and Kelly worked

on the same floor of Defendant's office and attended meetings together, and Sidhom's difficulty walking and getting around was apparent to them. During her treatment, Sidhom wore an electrical stimulation unit in the office with a visible battery pack and wires that ran out from under her shirt or clipped onto her clothing.

29. Following her back injury, Sidhom asked Warlick for permission to call into the team's quarterly business planning meeting in Greensboro, North Carolina, held in or around March 2025, to avoid driving one and one-half hours in excruciating pain. Warlick denied her request and offered no explanation other than telling her "Jenna wants you to be there." As a result, Sidhom was forced to drive one and one-half hours in pain. In contrast, David Wilt ("Wilt"), a male teammate, was permitted to dial in to meetings and to work from home for a similar back issue during this same time period. Sidhom saw Wilt in the office or at team meetings only a handful of times between April 2024 and July 2025. Throughout her active treatment and until her termination, Sidhom continued to ask to attend meetings remotely because of the pain from her back injury. Defendant denied those requests while permitting male teammates, including Wilt, to attend remotely.

30. On or about July 16, 2025, Defendant's Wealth Management group held a 9:00 a.m. meeting in Greensboro. Neither Warlick nor Kelly organized the meeting, and it was placed on the team's calendar approximately one week beforehand, while Sidhom was on vacation. Sidhom told Warlick that she would need to join the first half hour remotely from the road because the earliest she could drop her son off at camp was 8:00 a.m. Sidhom joined the meeting remotely at its start and then attended in person. Warlick nonetheless reprimanded Sidhom for arriving late and told her that the order of the bankers' presentations had to be rearranged, which was not true. Many of Sidhom's teammates attended the entire meeting remotely by Webex. Male teammates told

Sidhom that no one had told them in-person attendance was mandatory and that they also had learned of the meeting only that week. Warlick did not reprimand any of the teammates who attended remotely.

31. After Sidhom disputed the CAP, Defendant reallocated the client relationships of bankers who were leaving Defendant. Every banker on the team wanted to be allocated some of those relationships. Sidhom covered the team's textile and furniture companies as her industry focus, and Warlick and Kelly told Sidhom that she would receive one or two of the significant client relationships, principally Glen Raven. In or around the summer of 2025, after the transfer did not occur, Sidhom asked Warlick about it. Warlick responded that "Jenna said to hold off on the transfer for now." When Sidhom asked for the rationale, she received no answer. Kelly withheld the promised client relationships from Sidhom without providing any rationale.

32. In or around the summer of 2025, Defendant hired Trivedi, a male banker, to join Sidhom's team. Warlick then told Sidhom that he would take client relationships he had assigned Sidhom to cover within the prior year and transfer them to Trivedi because Trivedi had covered some of those relationships at his previous employer. Warlick did not apply that reasoning to Sidhom. When Sidhom joined the team, she told Warlick that she knew several companies Wilt was covering, but Warlick never asked Wilt to transfer those relationships to her, even when Wilt went out on medical leave and had made no progress with those companies.

33. During Sidhom's vacation, which began on or about July 6, 2025, Warlick insisted that she work throughout the week while also requiring her to formally submit her vacation time in Defendant's system. As a result, Sidhom worked during her vacation while Defendant charged her accrued vacation time for those days.

34. Kelly maintained only male direct reports in her management structure and had a reputation among employees for being harder on female bankers than on male bankers. On one occasion during a regional meeting, Kelly was so harsh with a female banker that multiple teammates asked the banker if she was alright after the meeting.

35. In the two months following Sidhom's termination, the two other female bankers in Kelly's region, Corrina Medellin ("Medellin") and Claire Veasey ("Veasey"), both resigned. Veasey resigned on or about August 29, 2025, because she felt she was being discriminated against. Medellin resigned on or about September 8, 2025.

36. On or about July 22, 2025, Defendant terminated Sidhom's employment during an unannounced meeting at a public coffee shop attended by both Warlick and Kelly. Defendant told Sidhom she was "not a fit for the role," was "not in office enough," and "did not have enough client meetings."

37. At the termination meeting, Defendant confiscated Sidhom's company laptop and key card. Defendant did not offer Sidhom any severance.

38. After terminating Sidhom, Defendant informed Sidhom's colleagues that she had "voluntarily left" Defendant.

39. The reasons Defendant gave for Sidhom's termination were false and pretextual. Sidhom had received a "building impact" rating on her most recent performance review, had closed a significant transaction approximately one month before her termination, and performed comparably to her male colleague Viscount, who had less experience and was not terminated. Defendant's claim that Sidhom was "not in office enough" was also pretextual, because Defendant permitted Wilt, a male teammate, to work from home for extended periods.

40. As an actual, proximate, and foreseeable result of Defendant's actions, Sidhom has suffered and continues to suffer lost wages and benefits, lost employment opportunities, and other damages.

## <u>FIRST CAUSE OF ACTION</u>
**(Violation of Title VII – Discrimination based on Sex)**

41. Sidhom realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

42. Defendant unlawfully discriminated against Sidhom because of her sex, female, by terminating her employment, while treating similarly situated male employees more favorably. The disparate terms and conditions of employment described above show Defendant's discriminatory motive for the termination.

43. Defendant's violation of Title VII was undertaken with malice or with reckless indifference to Sidhom's federally protected rights.

44. As an actual, proximate, and foreseeable result of Defendant's actions, Sidhom suffered lost back and front pay, benefits associated with her employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

## <u>SECOND CAUSE OF ACTION</u>
**(Violation of Title VII – Hostile Work Environment based on Sex)**

45. Sidhom realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

46. Defendant unlawfully discriminated against Sidhom by creating a hostile work environment based on her sex, female.

47. The conduct to which Sidhom was subjected was unwelcome, was based on her sex, and was sufficiently severe or pervasive to alter the terms and conditions of her employment

and create an abusive working environment. A reasonable person in Sidhom's position would have found the harassment to be severe, and Sidhom herself found the harassment to be severe. The hostile work environment continued until Defendant terminated Sidhom's employment on or about July 22, 2025. The adverse employment actions Sidhom suffered resulted from and formed part of that environment, including Warlick's text message to Sidhom on or about April 17, 2025 containing a sexually explicit TikTok video; Defendant's isolation of Sidhom from other employees, including male employees; Defendant's undercutting of Sidhom in front of clients; Defendant's micromanagement of Sidhom; Defendant's denial, throughout her active treatment and until her termination, of Sidhom's requests to attend meetings remotely, which Defendant granted to male teammates; Warlick's insistence that Sidhom work through her vacation week; his reprimand of Sidhom concerning her arrival at the meeting in Greensboro; and the termination of her employment. The hostile work environment began at the start of Sidhom's employment, intensified through the Warlick's text message and continued, in each of the ways described above, through the termination of Sidhom's employment.

48. Defendant's violation of Title VII was undertaken with malice or with reckless indifference to Sidhom's federally protected rights.

49. As an actual, proximate, and foreseeable result of Defendant's actions, Sidhom suffered lost back and front pay, benefits associated with her employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

**THIRD CAUSE OF ACTION**
**(Violation of Title VII – Retaliation)**

50. Sidhom realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

51. Sidhom engaged in activity protected by Title VII in that she reported discrimination in her written response to the CAP that she felt discriminated against on the basis of gender and that there was not a safe space for employees to report discrimination, and submitted documentation to Defendant's Human Resources department reporting that she was being subjected to bias and discrimination and treated differently than similarly situated male employees.

52. Sidhom had a reasonable, good faith belief that Defendant's conduct violated Title VII.

53. Defendant retaliated against Sidhom because she engaged in protected activity, including by withholding a promised client transfer, reassigning client relationships she had been assigned to cover to a newly hired male banker, and terminating her employment. Warlick and Kelly, Sidhom's direct and second-level supervisors, made the decision to terminate her employment for the purpose of retaliating against her for her written complaint of sex discrimination.

54. Defendant's violation of Title VII was undertaken with malice or with reckless indifference to Sidhom's federally protected rights.

55. As an actual, proximate, and foreseeable result of Defendant's actions, Sidhom suffered lost back and front pay, benefits associated with her employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

## **FOURTH CAUSE OF ACTION**
## **(Violation of the ADA – Discrimination)**

56. Sidhom realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

57. Sidhom's back impairment substantially limits her ability to stand, sit, lie down, and walk. Based on that impairment, Sidhom suffers from a disability within the meaning and

scope of 42 U.S.C. § 12102(1), has a record of such impairment, and/or was regarded by Defendant as having such impairment. Accordingly, Sidhom is a member of the class of persons protected by the ADA, which makes it unlawful for an employer to discriminate against a qualified individual with a disability regarding the terms and conditions of employment.

58. Sidhom was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of her position.

59. Defendant discriminated against Sidhom by subjecting her to disparate terms and conditions of employment and by terminating her employment for being "not in office enough" because of her disability. The severe pain caused by Sidhom's back injury limited her ability to attend the office and in-person meetings. Sidhom asked to attend meetings remotely because of that pain, and Defendant denied those requests. Warlick and Kelly knew of her injury and the limitations it imposed. Defendant's violation of the ADA was undertaken with malice or with reckless indifference to Sidhom's federally protected rights.

60. As an actual, proximate, and foreseeable result of Defendant's actions, Sidhom suffered lost back and front pay, benefits associated with her employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

**FIFTH CAUSE OF ACTION**
**(Violation of the ADA – Failure to Accommodate)**

61. Sidhom realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

62. Sidhom was a qualified individual with a disability within the meaning of the ADA who, with or without reasonable accommodation, could perform the essential functions of her position.

63. Defendant had notice of Sidhom's disability. In or around the week following her injury, Sidhom told Warlick and Kelly about her injury, and her limitations were apparent to both of them in the office and in meetings. Following her back injury, Sidhom requested a reasonable accommodation when she asked to attend the team's quarterly business planning meeting in Greensboro, North Carolina, held in or around March 2025, remotely to avoid driving one and one-half hours in excruciating pain. Throughout her active treatment and until her termination, Sidhom continued to request to attend meetings remotely because of the pain from her back injury.

64. The accommodation Sidhom requested was reasonable, and providing it would not have imposed an undue hardship on Defendant. Defendant permitted Wilt to work from home for a similar back issue during the same time period.

65. Defendant failed to engage in the interactive process and denied Sidhom's requests for a reasonable accommodation, including by telling her "Jenna wants you to be there," thereby forcing her to drive one and one-half hours in pain. Throughout her employment, including during her injury and continuing through the end of her employment, Defendant required Sidhom to attend many meetings in person. Defendant's violation of the ADA was undertaken with malice or with reckless indifference to Sidhom's federally protected rights.

66. As an actual, proximate, and foreseeable result of Defendant's actions, Sidhom suffered lost back and front pay, benefits associated with her employment, and has suffered and continues to suffer emotional distress, anxiety, embarrassment, and humiliation.

## SIXTH CAUSE OF ACTION
**(Wrongful Discharge in Violation of Public Policy on the Basis of Sex)**

67. Sidhom realleges and incorporates by this reference all the paragraphs above in this Complaint as though fully set forth herein.

68. The public policy of the State of North Carolina as set forth in N.C. Gen. Stat. § 143-422.2(a), part of North Carolina's Equal Employment Practices Act, prohibits employers from discriminating against employees on the basis of their sex. Sidhom is female and is therefore a member of a protected class. Defendant regularly employs 15 or more employees.

69. Defendant violated the public policy of North Carolina as set forth in N.C. Gen. Stat. § 143-422.2(a) by terminating Sidhom, a member of the protected class, on the basis of her sex.

70. As a proximate and foreseeable result of Defendant's conduct, Sidhom has suffered lost back and future wages and benefits, expenses, and other damages, which Sidhom seeks from Defendant.

71. Defendant's actions were done maliciously, willfully, or wantonly and with conscious and intentional disregard of and indifference to Sidhom's rights. Warlick, Defendant's Middle Market Banking Leader, and Kelly, Defendant's Regional President, are managers of Defendant who made the decision to terminate Sidhom and carried it out at the July 22, 2025 meeting, and thereby participated in the conduct giving rise to punitive damages. As a result of Defendant's conduct, Sidhom is entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Sidhom demands the following relief:

a. A Declaration and finding that Defendant violated provisions of Title VII by discriminating against Sidhom because of her sex;

b. A Declaration and finding that Defendant violated provisions of Title VII by subjecting Sidhom to a hostile work environment based on her sex;

c. A Declaration and finding that Defendant violated provisions of Title VII by retaliating against Sidhom because she engaged in protected activity;

d. A Declaration and finding that Defendant violated provisions of the ADA by discriminating against Sidhom because of her disability;

e. A Declaration and finding that Defendant violated provisions of the ADA by failing to provide Sidhom with a reasonable accommodation;

f. A Declaration and finding that Defendant violated North Carolina state law by wrongfully terminating Sidhom's employment in violation of North Carolina's clearly established public policy;

g. An Order requiring Defendant to pay Sidhom for all lost wages and employment benefits from the day Defendant terminated her employment until the day of final judgment;

h. An Order requiring Defendant to reinstate Sidhom to the position Defendant unlawfully terminated her from or award front pay in lieu thereof;

i. An Order requiring Defendant to pay Sidhom compensatory damages;

j. An Order requiring Defendant to pay Sidhom punitive damages on the Title VII and ADA claims under 42 U.S.C. § 1981a(b)(1) and on the state-law claims;

k. An Order requiring Defendant to pay Sidhom all attorneys' fees, litigation expenses, and costs incurred as a result of bringing this action;

l. An Order requiring Defendant to pay Sidhom pre- and post-judgment interest at the highest rates allowed by law on all sums recoverable; and

m. An Order granting such other and further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Sidhom demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 12, 2026.

Respectfully submitted,

/s/ Evan G. Gungor
Philip J. Gibbons, Jr., NCSB #50276
Evan G. Gungor, NCSB #60902
**GIBBONS LAW GROUP, PLLC**
10801 Johnston Road, Suite 211
Charlotte, North Carolina 28226
Telephone: (704) 612-0038
Facsimile: (704) 625-2835
E-Mail: phil@gibbonslg.com
evan@gibbonslg.com

*Attorneys for Plaintiff Sidhom*